# EXHIBIT 4

**Page 1**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

IRONSHORE INDEMNITY, INC.,
       Plaintiff,
v.                    CASE NO: 12-CV-61678-MGC
BANYON 1030-32, LLC, BANYON CAPITAL, LLC, BANYON
FUNDING, LLC, BANYON RESOURCES, LLC, BANYON
INVESTMENTS, LLC (NEVADA), BANYON USVI LLC, and BANYON
INCOME FUND, L.P.,
       Defendants.
_____/

            DEPOSITION OF JAMES CLARK
         Volume 1 of 2, Pages 1 through 158
                     Telephonic
                   July 18, 2013
                Adams and Reese, LLP
              101 East Kennedy Boulevard
                     Suite 4000
                 Tampa, Florida 33602

          Stenographically Reported By:
               AMY T. DESCHENES, FPR
           Florida Professional Reporter
```

**Page 2**

```
                    APPEARANCES
Ver Ploeg & Lumpkin, P.A.
100 SE 2nd Street
30th Floor
Miami, Florida 33131
305.577.3996
jmazer@vpl-law.com
BY: JASON S. MAZER, ESQUIRE
- For Trustee and Banyon entities

Gordon & Rees, LLP
One North Franklin Street
Suite 800
Chicago, Illinois 60606
312.565.1400
sschmookler@gordonrees.com
BY: SCOTT L. SCHMOOKLER, ESQUIRE
- For RLI, Columbia Casualty, and Zurich
  American Insurance Company

McIntosh Schwartz, P.L.
888 S.E. 3rd Avenue
Suite 500
Ft. Lauderdale, Florida 33316
954.660.9888
acooke@mcintoshschwartz.com
BY: ADAM B. COOKE, ESQUIRE
- For Ironshore Indemnity

Drinker, Biddle & Reath, LLP
1500 K Street NW
Suite 1100
Washington, DC 20005
202.842.8892
michael.koop@dbr.com
BY: MICHAEL J. KOPP, ESQUIRE
- For Westchester Insurance Company
```

**Page 3**

```
Carlton Fields
100 S.E. 2nd Street
Suite 4200, Miami Tower
Miami, Florida 33131
305.539.7239
pthompson@carltonfields.com
BY: CHRISTY L. MACPHERSON, ESQUIRE
- For Nation Union Fire Insurance

Adams and Reese, LLP
501 Riverside Avenue
7th Floor
Jacksonville, Florida 32202
904.355.1700
tvolpe@arlaw.com
BY: TIMOTHY W. VOLPE, ESQUIRE
     CAROLINE PRIETO, ESQUIRE
- For Harden & Associates

Quilling, Selander, Lownds, Winslett
  & Moser, PC
2001 Bryan Street
Suite 1800
Dallas, Texas 75201
214.871.2100
gwinslett@qslwm.com
BY: GREG K. WINSLETT, ESQUIRE
- For RLI Insurance Company

Mills Paskert Divers, P.A.
100 North Tampa Street
Suite 3100
Tampa, Florida 33602
813.229.3500
jblack@mpdlegal.com
BY: JAMES A. BLACK, JR., ESQUIRE
- For St. Paul Fire and Marine Insurance
  Company
```

**Page 4**

```
Hogan Lovells US LLP
Columbia Square
555 13th Street NW
Washington, DC 20004
202.637.6591
ellen.kennedy@hoganlovells.com
BY: ELLEN SWENNES KENNEDY, ESQUIRE
- For Federal Insurance Company
```

INDEX OF PROCEEDINGS

| Deposition of James Clark | Page |
|---|---|
| Direct Examination by Mr. Schmookler | 6 |
| Cross Examination by Ms. Kennedy | 132 |
| Cross Examination by Mr. Black | 139 |
| Cross Examination by Mr. Cooke | 145 |
| End of Volume 1 | 158 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 500 | Computer Information | 37 |
| 501 | Series of E-mails | 40 |
| 502 | 4/16/09 E-mail | 45 |
| 503 | 4/16/09 E-mail | 48 |
| 504 | E-mail to Tom Kocaj | 49 |
| 505 | E-mail to Mike Beranek | 49 |
| 506 | E-mail to Chip Eibe | 50 |
| 507 | E-mail | 99 |
| 508 | 5/19/09 E-mail | 102 |
| 509 | E-mail with Completed Application | 105 |

Page 61

1  provided to Zurich, attached as Exhibit 506, we again
2  see the account summary, the account overview.
3       Do you see that? It's the first document after
4  the e-mail.
5    A   Yes.
6    Q   HARB7286.
7    A   Yes.
8    Q   It's the very same account overview you
9  provided to Mr. Preve and you told him you were going
10 to circulate on behalf of the Banyon entities, correct?
11   A   Yes.
12   Q   And the account overview you provided to
13 Zurich is the very same account overview Mr. Preve
14 approved on behalf of the Banyon entities, correct?
15   A   Yes.
16       MR. MAZER: Form.
17   Q   And then we have the same flowchart we
18 have now seen twice, correct?
19   A   Yes.
20   Q   And this flowchart, HARB7287, 7288, is
21 the very same flowchart that you provided to Mr. Preve
22 on April 16th and told him that you were going to
23 circulate to the potential insurers, correct?
24   A   Yes.

Page 62

1    Q   And the flowchart you provided to Zurich
2  is the very same flowchart that Mr. Preve approved for
3  circulation on behalf of the Banyon entities, correct?
4    A   Yes.
5        MR. MAZER: Form.
6    Q   Then we have the biographical sketch, see
7  that?
8    A   Yep.
9    Q   That's the same biographical sketch that
10 you received from the Banyon entities?
11   A   Yes.
12   Q   The same biographical sketch that Mr. --
13 you told Mr. Preve you were going to circulate on
14 behalf of the Banyon entities, correct?
15   A   Yes.
16   Q   And it is the same biographical sketch
17 that Mr. Preve approved for circulation, correct?
18   A   Yes.
19       MR. MAZER: Form.
20   Q   The next document that you provided to
21 Zurich is a PowerPoint presentation, correct?
22   A   Yes.
23   Q   And the PowerPoint presentation you
24 provided to Zurich is the very same PowerPoint

Page 63

1  presentation you told Mr. Preve on April 16th you were
2  going to circulate on behalf of the Banyon entities,
3  correct?
4    A   Yes.
5    Q   And the PowerPoint presentation you
6  provided to Zurich is the very same PowerPoint
7  presentation that Mr. Preve, on behalf of Banyon
8  entities, approved for circulation, correct?
9    A   Yes.
10       MR. MAZER: Form.
11   Q   And then we have the letter, which we
12 have seen a couple times now. And the letter that you
13 provided to Zurich, HARB7304, 7305, is the very same
14 letter that you provided to Mr. Preve for approval by
15 the Banyon entities on April 16, 2009, correct?
16   A   Yes.
17       MR. MAZER: Form.
18   Q   And the letter that you provided to
19 Zurich is the very same letter that Mr. Preve, on
20 behalf of the Banyon entities, approved for
21 circulation, correct?
22   A   Yes.
23       MR. MAZER: Form.
24   Q   At any time did anyone on behalf of the

Page 64

1  Banyon entities say that any of the information in
2  Exhibits 504, 505, or 506 was incomplete or inaccurate?
3    A   No.
4    Q   At any time did anyone on behalf of the
5  Banyon entities tell you that the information in
6  Exhibits 504, 505, and 506 was in any way incomplete?
7    A   No.
8        MR. MAZER: Form.
9    Q   Based on your communications with
10 Mr. Preve, and Mr. Cipullo, and Mr. Levin, you were led
11 to believe that the information you provided to CNA,
12 Zurich, and RLI was truthful, correct?
13   A   Yes.
14       MR. MAZER: Form.
15   Q   You would have never provided any
16 information to Zurich, RLI, or CNA if you had known
17 Banyon was, in fact, lying to you, correct?
18   A   Correct.
19       MR. MAZER: Form.
20   Q   You wouldn't have provided any
21 information to RLI, CNA, or Zurich if you had known
22 that George Levin or Frank Preve were in on a Ponzi
23 scheme, would you?
24   A   Correct.

Page 65

```
 1        MR. MAZER: Form.
 2    Q   Did Mr. Preve ever tell you he was a
 3  criminal?
 4    A   No.
 5    Q   Did you know, even today, that Mr. Preve
 6  is a criminal?
 7        MR. MAZER: Form.
 8    A   Today, I know Frank Preve was a criminal.
 9    Q   Did Mr. Levin ever tell you that his
10  company, one of his prior companies, engaged in a
11  fraud?
12    A   No.
13        MR. MAZER: Form.
14    Q   So in all the course of dealing, trying
15  to get crime insurance, the two main people you were
16  dealing with, one never told you he was a criminal and
17  the other one never told you that he had company
18  engaged in a prior fraud, right?
19    A   Correct.
20        MR. MAZER: Form.
21    Q   You wouldn't have done business if you
22  had known that George Levin's prior company engaged in
23  a fraud and Frank Preve was a criminal, would you?
24        MR. VOLPE: Let me object to the form of
```

Page 66

```
 1  the question in that it calls for speculation.
 2    Q   Have you ever done business or placed
 3  insurance for someone who is a criminal?
 4        MR. MAZER: Form.
 5    Q   Crime insurance.
 6    A   Yes.
 7    Q   Other than Banyon?
 8    A   No.
 9    Q   The time you were working on the Banyon
10  account in April of '09 had you ever worked with anyone
11  to get them crime insurance knowing that they had
12  actually plead guilty to a federal crime?
13    A   No.
14    Q   Had you ever, in April of '09, ever
15  worked with anyone to get them crime insurance knowing
16  that their prior company had engaged in a fraud?
17    A   No.
18        MR. MAZER: Form.
19    Q   That's not your normal clientele, is it?
20    A   No.
21    Q   I would like to look at some of the
22  information you provided to my clients, if you would.
23        MR. VOLPE: What do you want him to
24  refer to?
```

Page 67

```
 1    Q   If you want to pick one of the exhibits,
 2  I don't care which one you look at. They are
 3  all the same.
 4        MR. VOLPE: He's got 506 in front of
 5  him, so let's use that one.
 6    Q   Okay. This account overview, we have
 7  talked about a number of times. I just want to
 8  highlight a couple key points in here.
 9        Under protection methods --
10        MR. VOLPE: May I interrupt you?
11        MR. SCHMOOKLER: Sure.
12        MR. VOLPE: Are you referring now to the
13  exhibit ending in Bates label 86, correct?
14        MR. SCHMOOKLER: Correct.
15        MR. VOLPE: Okay.
16  BY MR. SCHMOOKLER:
17    Q   So do you see the heading, protection
18  methods?
19    A   I do.
20    Q   And the bulletpoints underneath
21  protection methods are a summary of the internal
22  controls that you were led to believe existed at Banyon
23  by various representatives of Banyon, correct?
24    A   Correct.
```

Page 68

```
 1        MR. MAZER: Form.
 2    Q   So the information that you put under
 3  protection methods is information you gathered from
 4  Mr. Preve, Mr. Cipullo, and Mr. Levin, correct?
 5        MR. MAZER: Form.
 6    A   Correct.
 7    Q   And you see the second bulletpoint that
 8  you wrote there?
 9    A   I do.
10    Q   Says, and I quote, there is dual
11  signatures required for checks, Rothstein and Banyon
12  must both sign?
13    A   Yes.
14    Q   That was one of the internal controls you
15  were led to believe by Mr. Preve, Mr. Cipullo, and
16  Mr. Levin existed at the Banyon entities, correct?
17    A   Yes.
18        MR. MAZER: Form.
19    Q   That information, dual signatures
20  required for checks, Rothstein and Banyon must both
21  sign, came from the Banyon entities, correct?
22    A   Yes.
23        MR. MAZER: Form.
24    Q   You would have no way of knowing that but
```

17 (Pages 65 to 68)

```
                                                    69
 1   from getting it from the Banyon entities, would you?
 2      A    Correct.
 3      Q    Did you know at the time you wrote that
 4   statement and submitted it to my clients that that was
 5   just absolute falsehood?
 6      A    No.
 7      Q    Bear with me one second, Mr. Clark.
 8           And you knew, didn't you, sir, that -- you were
 9   led to believe that dual signatures were required for
10   checks because Banyon signed an application
11   representing that, didn't they?
12           MR. MAZER: Form.
13      A    Yes.
14      Q    When I say Banyon, I'm not talking
15   about -- I'm not talking about a stranger to Banyon.
16   The application was signed by the managing member,
17   correct?
18      A    Correct.
19      Q    And this representation by the Banyon
20   entities to you that there were dual signatures
21   persisted in April and May of 2009, correct?
22      A    Yes.
23           MR. MAZER: Form.
24      Q    It took -- it was provided to you
```

```
                                                    70
 1   repeatedly in various applications, wasn't it?
 2      A    Yes.
 3      Q    And then it was confirmed by Mr. Preve in
 4   a separate e-mail; wasn't that true?
 5      A    Yes.
 6           MR. MAZER: Form.
 7      Q    Let's look at the next bulletpoint. It
 8   says, there is monthly audit and reconciliation done by
 9   an outside firm, Onyx, that reports directly back to
10   the private equity companies on all transactions to
11   ensure they are correct.
12           Do you see that?
13      A    Yes.
14      Q    That was an internal control that was
15   represented to you exists by the Banyon entities,
16   correct?
17      A    Correct.
18      Q    You did not know at the time you
19   submitted this that the Banyon entities were lying and
20   that that control didn't exist, did you?
21      A    No.
22           MR. MAZER: Form.
23      Q    The next control, Scott Rothstein has a
24   satellite-controlled password system that updates the
```

```
                                                    71
 1   password on the bank account every 60 seconds. In
 2   order to access the funds you need that password.
 3           Do you see that?
 4      A    I do.
 5      Q    That is a control that the Banyon
 6   entities represented to you existed, correct?
 7      A    That is correct.
 8           MR. MAZER: Form.
 9      Q    Then it says, the next bullet --
10   Scott Rothstein has given the code to send money. His
11   CFO is the one internally that reconciles and sets up
12   the transfer, and the COO handles all the paperwork.
13           Do you see that?
14           MR. VOLPE: Pardon me. You misread
15   that.
16           MR. SCHMOOKLER: I will try again.
17      Q    The second-to-last bulletpoint reads,
18   Scott Rothstein has to give the code to send money, his
19   CFO is the one internally that reconciles and sets up
20   the transfer, and the COO handles all of the paperwork.
21           Do you see that?
22      A    I do.
23      Q    That is an internal control that was
24   represented to you by the Banyon entities as existing,
```

```
                                                    72
 1   correct?
 2           MR. MAZER: Form.
 3      A    Yes.
 4      Q    All of the bulletpoints that I have just
 5   read is information that was provided to you by the
 6   Banyon entities, correct?
 7      A    Correct.
 8           MR. MAZER: Form.
 9      Q    Let's turn to the PowerPoint
10   presentation. You understood from your discussions
11   with the Banyon entities, did you not, that the
12   PowerPoint presentation was intended to be a summary of
13   Banyon's business and internal controls, correct?
14           MR. MAZER: Form.
15      A    Can you rephrase the question?
16      Q    Sure. You understood from your
17   conversations with Mr. Cipullo, Mr. Preve, and
18   Mr. Levin that the PowerPoint presentation that you
19   were providing to the insurers was a description of
20   Banyon's business and its internal controls, correct?
21      A    Correct.
22           MR. MAZER: Form.
23      Q    And the purpose of you providing it to
24   the insurers was so the insurers would have some
```

```
                                                    73                                                      75
 1   understanding of Banyon's business and Banyon's       1      Q    And do you see the -- where it says,
 2   internal controls, correct?                           2   quote, A special purpose trust account will require
 3      A   Correct.                                       3   dual signatures and Banyon will have survivorship
 4      Q   If you could look at HARB7297, a sheet         4   rights?
 5   entitled, document flow.                              5      A   Yes.
 6      A   Give me that number again?                     6      Q   Those aren't words you drafted, are they?
 7      Q   97.                                            7      A   No.
 8      A   97. Thank you.                                 8      Q   Those are words Banyon drafted and Banyon
 9      Q   Based on your conversations with the           9   provided to you, correct?
10   Banyon entities, was it your understanding that this 10      A   Correct.
11   sheet of paper described how the deals worked from a 11      Q   Did you understand in discussing Banyon's
12   temporal perspective?                                12   internal controls of looking at the PowerPoint
13          MR. MAZER: Form.                              13   presentation that one of the things they were
14          MR. VOLPE: Let me object to the form of       14   representing to you was that one of the internal
15      the question. Do you mean that this is a -- in    15   controls in place was this dual signature requirement?
16      a linear sense from the top to the bottom,        16      A   Yes.
17      something --                                      17      Q   And you understood from working on this
18      Q   A chronology. Maybe I'll say this a           18   account that the dual signature requirement was a key
19   different way.                                       19   internal control being represented by Banyon, correct?
20          Was the information, based on your            20          MR. MAZER: Form.
21   conversations with the Banyon entities, your         21      A   Can you rephrase your question, repeat?
22   understanding that this sheet of paper entitled,     22      A   Sure. You understood that one of the
23   document flow, was like a chronology of how the deals23   internal controls being represented by Banyon to exist
24   worked?                                              24   to you and then ultimately to the insurers was this

                                                    74                                                      76
 1      A   It is how they put it out for the deals        1   concept of dual signatures, correct?
 2   to work, how they wanted to deals to be explained.    2      A   Yes.
 3      Q   From a chronologic perspective meaning         3      Q   And you know -- you have an idea of what
 4   what would happen first, second, third, fourth?       4   dual signatures are, right?
 5      A   Correct.                                       5          MR. MAZER: Form.
 6      Q   And so at the time you were working with       6          MR. VOLPE: Let me object to the form.
 7   Banyon -- I know it is a little hard to separate what 7      Q   I will rephrase. Will you look at Page
 8   you currently know what you knew then. But at the time8   14 of the PowerPoint, HARB7303? Do you see where it
 9   you were working on behalf of Banyon in, you know,    9   says, conclusion?
10   April of 2009, it was your understanding from your  10      A   I do.
11   discussions with them and the materials they provided11      Q   Then it says, quote, Very low risk, high
12   you that there would be certain documentation provided12  volume, high-yield business. Do you see that?
13   before they would issue any checks, correct?        13      A   I do.
14          MR. MAZER: Form.                             14      Q   Those are also words chosen by Banyon,
15      A   I don't know what I understood from their    15   correct?
16   business operation standpoint.                      16      A   Yes.
17      Q   Can you turn to the next page?               17      Q   And it was your understanding in April of
18      A   Uh-huh.                                      18   2009 that Banyon was pitching this deal -- pitching
19      Q   Where it says risk mitigation. Do you        19   these deals as very low risk, correct?
20   see that? Do you see that, sir?                     20      A   I --
21      A   I do.                                        21          MR. VOLPE: Let me object to the form of
22      Q   The words risk mitigation, those are         22      the question. Are you saying that that's how
23   words chosen by Banyon, right?                      23      they represented it to him?
24      A   Correct.                                     24      Q   Yeah. That's how they pitched it --
```

**Page 77**

1  MR. MAZER: Form.
2  Q  -- to you. Let me rephrase so we
3  actually have a real question on the transcript.
4  A  Okay.
5  Q  In April of 2009, when you were helping
6  Banyon get insurance, Banyon was representing to you
7  that it was engaged in a very low-risk business,
8  correct?
9  A  Yes.
10  Q  Did you know at the moment that they were
11  representing to you a very low-risk business they were
12  out in the world representing to others this was a very
13  high-risk business?
14  MR. MAZER: Form.
15  A  No.
16  Q  Now, let's look at the letter which we
17  have also seen a number of times today. This is a
18  letter you drafted, correct?
19  A  I don't recall if I drafted it.
20  Q  Somebody at Harden drafted it?
21  A  I don't recall if somebody at Harden
22  drafted it.
23  Q  Did you sign it?
24  A  I did sign it.

**Page 78**

1  Q  And this is the letter you provided to
2  Mr. Preve and he approved, right?
3  MR. MAZER: Form.
4  A  Yes.
5  Q  And this letter communicates information
6  about Banyon and the proposed insurance, right?
7  A  Yes.
8  Q  One of the things that the letter says at
9  the bottom of the page, the last paragraph, HARB7304,
10  says, quote, The settlement money is being held in five
11  separate trust accounts governed by the Florida Bar
12  Association Rules and Regulations.
13  Do you see that?
14  A  I do.
15  Q  At the moment -- strike that.
16  You learned that information from your
17  discussion with Mr. Preve, Mr. Cipullo, and Mr. Levin,
18  correct?
19  A  Correct.
20  MR. MAZER: Form.
21  Q  At the moment that you were led to
22  believe by Mr. Preve, Cipullo, and Mr. Levin that money
23  was being held in trust accounts governed by the
24  Florida Bar Association Rules and Regulations, did they

**Page 79**

1  happen to tell you they were also being led to believe
2  that Mr. Rothstein was being investigated by the
3  Florida Bar Association?
4  A  No.
5  Q  At the time that Mr. Cipullo, Mr. Levin,
6  and Mr. Preve were representing to you that the money
7  was in trust accounts governed by the Florida Bar
8  Association Rules and Regulations, did they happen to
9  mention to you that Mr. Rothstein told them that the
10  accounts had been frozen?
11  A  No.
12  MR. MAZER: Form.
13  Q  You wouldn't have been able to write the
14  sentence you wrote, would you, if Mr. -- if you had
15  learned that Mr. Rothstein had told Mr. Levin and
16  Mr. Preve that he was being investigated by the
17  Florida Bar Association and that his accounts had been
18  frozen?
19  MR. MAZER: Form.
20  Q  You wouldn't have written it that way,
21  would you?
22  A  I would be speculating.
23  Q  You had conversations before you wrote
24  this letter with Mr. Levin, Mr. Preve, and Mr. Cipullo

**Page 80**

1  about the proposed insurance, correct?
2  A  Restate that question.
3  Q  Prior to writing -- prior to signing this
4  letter, you had had discussions with Mr. Levin, and
5  Mr. Preve, and Mr. Cipullo about the proposed
6  insurance, right?
7  A  I'm not certain of all of the dates of
8  conversation.
9  Q  You had had some communication -- I'm
10  just trying to lay a foundation here. You had had some
11  communication with them?
12  A  Yes. Yes.
13  Q  Part of the things that you had talked
14  about with Mr. Preve, and Mr. Cipullo, and Mr. Levin is
15  what kind of insurance they wanted, right?
16  A  Yes.
17  Q  And one of the things that you
18  communicated to the insurers in this letter is the type
19  of insurance that Mr. -- that the Banyon entities were
20  seeking, correct?
21  A  Yes.
22  Q  And this letter, the very letter that
23  Mr. Preve approved, communicates to the excess insurers
24  the type of insurance that Banyon would like, correct?