# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 12-61678-CIV-COOKE/TURNOFF

IRONSHORE INDEMNITY, INC., et al.,

        Plaintiffs,

        v.                           Case No. 12-CV-61678-MGC

BANYON 1030-32, LLC, et al.,

        Defendants.

_____/

## AFFIDAVIT OF THOMAS HUBER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I, Thomas Huber, being duly sworn, hereby affirm that I have personal knowledge of the following facts and can competently testify to the following facts if called to testify at trial:

1.    I am an assistant vice president at RLI Insurance Company ("RLI"). I received an undergraduate degree in 1990 and master's degree in 1992, both from Rider University. Since 1992, I have worked as an underwriter for the St. Paul Companies, CNA Insurance, Hartford Financial Services Group, and RLI. In those positions, I gained experience underwriting commercial crime policies, fidelity bonds and financial institution bonds, and obtained knowledge of facts and circumstances material to the underwriting of commercial crime policies, fidelity bonds and financial institution bonds.

2.    Since 2008, I have been employed at RLI as an underwriter. I was and am familiar with RLI's policies and procedures for underwriting excess commercial crime policies.

3.    I was the underwriter responsible for reviewing the underwriting submission

1

provided to RLI on behalf of the Banyon Entities.

4.      RLI received the Banyon Entities' underwriting submission on May 1, 2009 from Jimmy Clark, a broker with Harden & Associates.  RLI had no prior relationship with Mr. Clark and understood that he was acting as a broker for the Banyon Entities.  Attached to this affidavit (hereinafter "Underwriting Submission") are true and accurate copies the documents RLI received from Mr. Clark on May 1, 2009.   The Underwriting Submission includes (a) a PowerPoint presentation; (b) a flowchart; (c) consolidated financial statements; (d) a biography of Levin; (e) an "Account Overview"; and (f) a sample of Federal Insurance Company's commercial crime policy.

5.      RLI read and analyzed all of the documents contained in the Underwriting Submission before issuing a quote on May 7, 2009.  RLI reviewed the Underwriting Submission again prior to issuing the binders on June 25, 2009.  During both reviews, RLI analyzed the Underwriting Submission to determine the nature of the Banyon Entities' business, what the Banyon Entities were seeking to insure, and what internal controls they employed to safeguard against theft.  Relying upon the truth of the representations in the Underwriting Submission, RLI issued two excess insurance policies ("Excess Policies") to the Banyon Entities.

6.      The PowerPoint Presentation provided on behalf of the Banyon Entities, in a section titled "RISK MITIGATION", represents that "100% of the Settlement Funds cover by the Settlement Agreement are wired to and received by the special purpose Trust Account before any disbursements are made by the FI."  RLI relied on the truthfulness and accuracy of this representation when issuing the Excess Policies.   This representation impacted RLI's underwriting analysis and induced it to issue the Excess Policies because advancing funds without any confirmation that the transaction existed and was funded presents a heightened risk

2

of fraud.  For that reason, RLI would not have agreed to issue the Excess Policies if the Banyon Entities had informed it that they were advancing money against unfunded settlements.

7.     The PowerPoint Presentation provided on behalf of the Banyon Entities, in a section titled "RISK MITIGATION", represents "FI will have all executed documents necessary to access the Trust Funds BEFORE any disbursements are made."  RLI read and relied on the truthfulness and accuracy of this representation when issuing the Excess Policies. This representation impacted RLI's underwriting analysis because the absence of deal documentation increases the risk of fraudulent transactions (as the Banyon Entities could not authenticate the legitimacy of the transactions). For that reason, RLI would not have issued the Excess Policies if the Banyon Entities had informed it that they advanced money without documentation of the underlying settlements.

8.     The Account Summary provided on behalf of the Banyon Entities, in a section entitled "Protection Methods", represents that "[t]here is (sic) dual signatures required for checks – Rothstein and Banyon must both sign." RLI read and relied on the truthfulness and accuracy of this representation when issuing the Excess Policies. This representation impacted RLI's underwriting analysis because requiring dual signatures reduces the risk of theft (by limiting how Rothstein could withdraw funds from the trust accounts). For that reason, RLI would not have issued the Excess Policies if the Banyon Entities had informed it that Rothstein could withdraw funds from the trust account without the Banyon Entities' consent.

9.     The Account Summary provided on behalf of the Banyon Entities, in a section entitled "Protection Methods", represents that "Rothstein manages the trust funds but Banyon and Rothstein both reconcile the accounts."  RLI read and relied on the truthfulness and accuracy of this representation when issuing the Excess Policies.  This representation impacted RLI's

3

underwriting analysis because reconciliation of accounts provides a timely means of discovering unauthorized or fraudulent transfers.  For that reason, RLI would not have issued the Excess Policies if the Banyon Entities had informed it that they had no means of monitoring the withdrawals from the trust accounts.

10.     The PowerPoint Presentation provided on behalf of the Banyon Entities represents that the flow of documents includes "Collection of payments per Settlement Agreement Schedule."  RLI relied on the truthfulness and accuracy of this representation when issuing the Excess Policies.  This representation impacted RLI's underwriting analysis because it was a means fort the Banyon Entities to monitor Rothstein's activities and limit any potential loss.  For that reason, RLI would not have issued the Excess Policies if the Banyon Entities had informed it that Rothstein refused to make disbursements from the trust accounts and was past due.

FURTHER AFFIANT SAYETH naught.

Executed on: _5 - 14 - 2014_

_Tony Huber_

Mr. Thomas Huber
RLI Insurance Company

Subscribed and sworn to before me this

_14th_ day of May 2014

_Carol A Matullo_

Notary Public

CAROL A. MATULLO
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES 2/25/20 18

| | |
|---|---|
| **From:** | James Clark |
| **Sent:** | Friday, May 01, 2009 12:45 PM |
| **To:** | 'Michael.Beranek@rlicorp.com' |
| **Subject:** | Excess Crime: Banyon 1030-32, LLC |
| **Attachments:** | Account Overview.doc; Flowchart.xls; George Levin Bio.pdf-000000000013535.pdf; PowerPoint 08.pdf; Coverletter.pdf; Chubb Agt endt..pdf; ChubbPolicy.pdf; Financial Statements.pdf; Tower-JRC-Current.xls |

Michael,

Please take a look at this submission and let me know if you would like to participate. Crum & Forester suggested I contact you as they felt it would be a risk you would likely be interested in. Per our contract, we are looking for 20% commission to be built into the quote.

I would suggest reading the following in this order:

1) Coverletter.pdf
2) Account Overview.doc
3) Flowchart.xls
4) PowerPoint.08

Chubb is taking the primary which I have attached their quote. The Tower-JRC-Current shows the current pricing & current layers. Crum & Forester should be confirming their $10MM on Monday but feel free to offer to quote that layer as well. All other layers are confirmed. We are looking to build at least to $100MM and potentially higher.


**James R. Clark II**
Harden & Associates
Vice President

 *Think green, keep it on the screen.*

---

1715 N Westshore Blvd Suite #345, Tampa, FL 33607 | 813.367.5609 | 904.446.4200 | jclark@hardenassociates.com

NOTICE: This message is confidential, intended for the named recipient(s) and may contain information that is (i) proprietary to the sender, and/or, (ii) privileged, confidential and/or otherwise exempt from disclosure under applicable Florida and federal law, including, but not limited to, privacy standards imposed pursuant to the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Receipt by anyone other than the named recipient(s) is not a waiver of any applicable privilege. Thank you in advance for your compliance with this notice.

1



**HA-RB07627**

## Banyon Account Overview

### What does Banyon do?

Banyon purchases settlements from plaintiffs at a discount. For example, a company is sued for an employment practices claim. The company decides to settle but wants a guarantee that the person suing doesn't pursue any further action without any potential recourse for the company to get its money back. To do this, they fully fund a trust account and make the trust pay the plaintiff over 6-9 months. Banyon pays the plaintiff 60-70% of the value in the trust in a lump-sum then is assigned the money in the trust.

### How did Banyon get involved?

George Levin, the principal of Banyon, was approached by Scott Rothstein of Rothstein, Rosenfeldt Adler, a law firm. Scott's issue was that the current company buying the settlements took too much time to get their money together. The advantage to Mr. Rothstein is he also gets his percentage of the claim up-front as the lawyer. Since George Levin is individually very wealthy he agreed to personally fund these up to $200,000,0000. Once George saw the potential returns of these he decided to bring in private equity funds to get additional capital cheaper than using his own.

### What are we insuring?

We are insuring the actions of either Rothstein, Rosenfeldt, Adler as the trust manager or Banyon employees stealing money. There are currently five trust accounts that hold all of the money that are the named insureds.

### Protection methods

- Rothstein manages the trust funds but Banyon and Rothstein both reconcile the accounts.
- There is dual signatures required for checks – Rothstein & Banyon must both sign
- There is a monthly audit & reconciliation done by an outside firm, Onyx, that reports directly back to the private equity companies on all transactions to ensure they are correct.
- Scott Rothstein has a Satellite controlled password system that updates the password on the bank account every 60 seconds. In order to access the funds you need that password.
- Scott Rothstein has to give the code to send money, his CFO is the one internally that reconciles and sets up the transfer and the COO handles all of the paperwork.
- The private equity fund has direct access to the lock account and is notified when funds are transferred into it. They sweep the money thereafter.

**HA-RB07628**



HA-RB07629

Ex. 8-7

HA-RB07630



# Simple Flowchart

**Important** Two toolbars are available with this template to help you create flowcharts. To display these toolbars, point to **Toolbars** on the **View** menu, and then click **Flow Shapes**. Point to **Toolbars** on the **View** menu, and then click **Flow Connectors**.

**Hints**
- To create a flowchart, you can modify this example or you can start from scratch to create your own flowchart.

**To add flowchart shapes**
- On the **Flow Shapes** toolbar, click the shape you want, and then click where you want to draw the flowchart shape.

**To add connectors between the shapes**
1. On the **Flow Connectors** toolbar, click the connector line you want.
2. Point to where you want to lock the connector.
3. Click the first connection site you want, point to the other shape, and then click the second connection site.

- To delete the sample flowchart and these instructions, click Go to on the **Edit** menu, click **Specify**, select the Objects option, click OK, and then press DELETE.

Ex. 8-8

# GEORGE G. LEVIN
## Biographical Sketch
December 31, 2007

George Levin began his business career by learning the challenges of the retail industry in the Philadelphia area in the 1960's. At the age of 27 he was in charge of 15 stores with over $200,000,000 in sales. Five years later he had created and then sold a chain of apparel stores and had 'retired' to Florida. There he became a collector of antique automobiles and an expert in ocean-going yachts.

During the 1980's Mr. Levin made a number of real estate investments and established several operating companies. The latter included the world's first FRP carbon fiber yacht manufacturing facility (Sterling Yachts) located in Ici City, Japan. This facility produced a number of spectacular ships in the 40m-50m classification including the Southern Cross (183'), the Lady Fita (147'), the Ruska (147'), the Polar Bear (123'), the Shalimar (141'), and the Pastaley (150').

His real estate investments were in "design" centers in West Palm Beach and Miami, hotels in Palm Beach and Atlantic City, NJ, retail centers in South Miami, Pompano Beach, and West Palm Beach, and in numerous parcels of undeveloped acreage.

Also in the 1980's George created the largest chain of dedicated Thomasville Furniture Showcases in the U.S. and restored the Madison House hotel in Atlantic City to its 1920's glory.

In the 1990's he led the investment in the takeover of Otto Gerdau's, one of the largest exotic-products trading companies in the world which was headquartered on Wall Street. He was also responsible for resurrecting Thinking Machine's and directing its sale to Oracle Corp in June 1999. He early on invested in a number of Internet stars.

Mr. Levin has had raw land investments in New York, North Carolina, West Virginia and Florida totaling more than 5,000 acres. In addition he has income producing properties in New Jersey, New York, North Carolina, and Florida. These investments include farm and timber properties, manufactured housing parks, hotels, condominiums, and retail/office sites.

He currently controls the single largest piece of land with continuous accessible road frontage adjacent to the new Southwest Florida International Airport in Ft Myers/Naples, Florida. The proposed development with bring almost 2,000,000 square feet of construction to the 323 acre parcel.

In 2006 he acquired a 166,000 sf office building in Fort Lauderdale and a 156 unit apartment complex in Gainesville, Florida.

His equity positions include the Internet sector, technology, environmental, construction, health, and leisure stocks.

The common philosophy found in all of these investments is the energizing role that Levin's capital plays. This role is almost exclusively that of seed money fostering the development of ideas to fruition.

Because of his philanthropic interests, Mr. Levin has also nurtured the birth and expansion of several non-profit corporations serving the public interest. These include American Credit Counselors, Inc. and the Lighthouse Preservation Society, Inc., both of which are qualified under IRS rule 501c(3) as charitable foundations. American Credit is focused on educating and assisting consumers on the role debt plays in the financial well being of the American family. This young company has already counseled more than 55,000 individuals and families in the past five years. The Lighthouse and Historic Building Preservation Society is dedicated to maintaining environmentally sensitive and historically significant buildings and lighthouse structures throughout the country and along the U.S. shoreline.

In 2007 Mr. Levin established Banyon Funding which specializes in confidential settlement funding. Banyon settled $50 million in cases during its first year of operation and will settle more than $150,000,000 during 2008.

HA-RB07631

# LABOR & EMPLOYMENT SETTLEMENT FINANCING

## A Low Risk Investment Strategy

### September 2008

### Banyon 1030-32, LLC

CONFIDENTIAL AND PROPRIETARY

9/1/2008 V6

1

HA-RB07632

# OBJECTIVE

Establish a credit facility based on purchased agreements

Face value of transactions exceed funding by at least 140%

Transactions are self-liquidating

Credit facility would have a "bad boy" guaranty by George Levin

2

CONFIDENTIAL AND PROPRIETARY

9/1/2008 V6

**HA-RB07633**

# BACKGROUND

L&E Settlement Financing has largely been ignored because it is a niche market and lacks visibility due to confidentiality issues

Most financing houses focus on Personal Injury, Workers Comp, and Liability settlements, i.e., "Structured Settlements"

L&E settlements require expediency and confidentiality

9/1/2008 V6

CONFIDENTIAL AND PROPRIETARY

3

**HA-RB07634**

# BACKGROUND (Continued)

**CONFIDENTIALITY:** Unlike most liability and personal injury settlements, total separation on all levels between plaintiff and defendant is mandated by the agreement; all cases, if filed, are filed under "sealed" conditions as are any negotiated settlement agreements.

**EXPEDIENCY:** Cases that have been pending for years often only have one or two optimum settlement points which must be exploited within a one or two day time frame

CONFIDENTIAL AND PROPRIETARY

4

9/1/2008 V6

**HA-RB07635**

# CONFIDENTIALITY ISSUES

Defendant Identity:  Parties external to the settlement agreement cannot identify defendants

Names, Case Numbers, and other identifying nomenclature must be protected at all costs

Inadvertent disclosure must be covered by very restrictive NDA's

5

CONFIDENTIAL AND PROPRIETARY

9/1/2008 V6

**HA-RB07636**

# CONFIDENTIALITY MECHANICS

Settlement Agreements must be redacted to protect the identity of the defendants

Trust accounts must be titled with a reference number that is tied to the Settlement Agreement and to the Assignment & Purchase Agreements

Original Settlement Agreement is to be held in trust (and confidence) by plaintiff law firm

Plaintiffs must be prepared from beginning of case as to criticality of confidentiality

9/1/2008 V6

CONFIDENTIAL AND PROPRIETARY

6

HA-RB07637

# EXPEDIENCY ISSUES

- Legal Team must have broad range of financial options to penetrate settlement barriers

- Financial parameters need to be pre-set in terms of payout schedules, margins, disbursement points, etc.

- Plaintiffs are prepped from beginning of case as to ultimate value of a settled case

CONFIDENTIAL AND PROPRIETARY

9/1/2008 V6

7

HA-RB07638

# DOCUMENT FLOW

Agency Agreement

Settlement Agreement

Trust Account Creation

Wire Transfer to Trust Account

Plaintiff Assignment of Settlement Agreement and Proceeds to Financial Intermediary (PSTA (Plaintiff and Banyon)

Acknowledgement of the Assignment by Trustee

Check issued to Plaintiff

Verification of Disbursements by independent 3rd Party

Collection of payments per Settlement Agreement Schedule

9/1/2008 V6

CONFIDENTIAL AND PROPRIETARY

8

**HA-RB07639**

# RISK MITIGATION

100% of the Settlement Funds cover by the Settlement Agreement are wired to and received by the special purpose Trust Account before any disbursements are made by the FI

The special purpose Trust Account will require dual signatures and Banyon will have survivorship rights. FI will have all executed documents necessary to access the Trust Funds BEFORE any disbursements are made

9/1/2008 V6

CONFIDENTIAL AND PROPRIETARY

9

Ex. 8-18

**HA-RB07640**

# RISK MITIGATION (Continued)

Plaintiff will have claw backs in Assignment that will allow FI to attach assets in case of violations

Defendants have no interest in publicly pursuing ex-employee because of the negative publicity that would result

CONFIDENTIAL AND PROPRIETARY

9/1/2008 V6

10

**HA-RB07641**

# RETURN ON INVESTMENT

The range of discount from the face value of the Plaintiff's share of the Settlement Agreement is normally 15% to 40% but are a function of amounts, timing, and scheduling of repayments

9/1/2008 V6

CONFIDENTIAL AND PROPRIETARY

11

HA-RB07642

# CURRENT DEAL PROFILE

Maturity Schedule: 70% of Deals Return 100% of Gross Funds (Funding plus Margin) within eleven months

Maximum Exposure: Max Funded Exposure is 14 months; maximum unfunded margin is 24 months

Average Size (153 Transactions): Funded $1,500,000; Funded plus Margin $2,500,000

9/1/2008 V6

CONFIDENTIAL AND PROPRIETARY

12

HA-RB07643

# CURRENT BOOK

Settlements total more than $400,000,000 to date (not including legal fees)

Currently have more than $270,000,000 in trust accounts

Banyon Group has more than $170M in established lines of credit

Net Worth of Banyon Group is almost $50 million

9/1/2008 V6

CONFIDENTIAL AND PROPRIETARY

13

HA-RB07644

# CONCLUSION

Very low risk, high volume, high yield business

Requires high degree of settlement and operational expertise

Each operation must be transactionally segregated

Confidentiality standards must be ultra high

CONFIDENTIAL AND PROPRIETARY

9/1/2008 V6

14

**HA-RB07645**



HARDEN&
ASSOCIATES

April 16, 2009

Atten: Crime/Fidelity Underwriters

Attached you will find a submission for excess coverage for a unique insured whose services involve litigation "settlement funding" for clients who have reached satisfactory resolution to Employment Practices (EPL) lawsuits.

Our insured, Banyon 1030-32, LLC and related entities, is providing funding settlement services for clients of a law firm who prefer discounted "lump sum" EPL settlements instead of being paid the full settlement amount over a longer timeframe. We have obtained a primary quote from Chubb and are seeking excess layers to provide crime coverage for theft/misappropriation of both "settlement money" and "investor funded" money.

Banyon was formed in January of 2007. One of the legal documents provided by the insured describes the services as follows: "One of purchasing paper at a discount: the paper is secured by trust proceeds. The proceeds are dispersed over time directly to Banyon who is the beneficial owner of the trust account which provides transactional security. Most of the paper is generated by legal settlements where the plaintiff has executed a confidentiality and settlement agreement over time with a company but the plaintiff wants a lump sum payment. These are all statutory labor and employment cases (pay discrimination, racial discrimination, sexual harassment, whistle blower, etc...)"

While there are other entities that provide "settlement funding" services, Banyon has focused its niche in the area of Employment Practices settlements. This niche area of settlement combined with Banyon's relationship with one of the top EPLI plaintiff firms in the country provides tremendous growth possibilities.

Banyon has joined forces with a premier law firm located in Fort Lauderdale, Florida. The firm is Rothstein Rosendeldt Adler. Additional information on this firm can be found at : www.rra-law.com

Our goal with this insurance program is to provide crime coverage (fidelity) with total limits of $250MM. The crime coverage being requested is intended to be twofold.

First, coverage should insure against theft/misappropriation of funded "settlement monies" held in trust accounts by the Rothstein law firm. The second exposure is the theft / misappropriation of "investors monies" held by Banyon.

The settlement money is being held in 5 seperate trust accounts governed by Florida Bar Association rules and regulations. The investor money is being held in a blocked Banyon account. Coverage will need to insure against theft/misappropriation of this settlement money

INSURANCE, RISK MANAGEMENT, EMPLOYEE BENEFITS
1715 N. WESTSHORE BLVD, STE #345 • TAMPA, FL 33607 • TELEPHONE (813) 367-5000 • FAX (904) 460-4700

© Harden & Associates, Inc. 2003.  All rights reserved. No publication, distribution, or copying of this material, in whole or in part, is permitted without prior written permission of Harden & Associates, Inc.

**HA-RB07646**



HARDEN&
ASSOCIATES

from either Banyon or the Rothstein law firm. There is a flow chart attached to this submission that depicts a sample funded settlement transaction.

We have secured primary crime quote from Chubb. This quote is $5MM in Limit with $500,000 retention. When review the Chubb quote, please pay particular attention to the insuring agreement for "client coverage" and the manuscript "Agent" endorsement. The insuring agreement for "client coverage" was added to the Chubb indication to clarify coverage for the investors' money placed with Banyon to fund these settlements. The Agent endorsement was added to clarify the coverage intent that the Banyon policy is extended to cover the settlement money held in the IOTA trust accounts by the law firm (Rothstein Rosenfeldt Adler)

Excess terms provided will need to "follow-form" the Chubb primary program. We ask that your quickly respond to the following:

- Please clear and reserve the submission and notify us that it has been logged
- Please advise to the available capacity and attachment to the program. Again, our goal is to build $250MM in coverage.
- Please provide any pricing guidelines or minimum premiums relative to your offered layers.

For your underwriting review, we have included the following documents:
1) Account Overview
2) Primary Chubb Proposal with forms
3) Flow chart outlining a sample transaction
4) Power Point Presentation
5) Financials
6) Biography of principal of Banyon – George Levin

Sincerely,

James Clark, RPLU, ARM, AAI
Vice President

INSURANCE, RISK MANAGEMENT, EMPLOYEE BENEFITS
1715 N WESTSHORE BLVD. STE 346 • TAMPA, FL 33607 • TELEPHONE (813) 367 5600 • FAX (904) 448 6200

© Harden & Associates, Inc. 2003. All rights reserved. No publication, distribution, or copying of this material, in whole or in part, is permitted without prior written permission of Harden & Associates, Inc.

**HA-RB07647**

**ENDORSEMENT/RIDER**

[Print Coverage Section description on Endorsements]

Effective date of
this endorsement/rider: [Transaction
Effective Date]

[Carrier name]

Endorsement/Rider No. [Endorsement number that
is calculated when form fill-ins are entered]

To be attached to and
form a part of Policy No. [Formatted Policy Number]

Issued to:  [Account Name]

---

## AGENT EXTENSION ENDORSEMENT
### (WITH SUBLIMIT OF LIABILITY AND SEPARATE DEDUCTIBLE AMOUNT)

In consideration of the premium charged, it is agreed that:

(1)     Notwithstanding anything to the contrary contained in Subsection III. Exclusion (B) of this coverage section and solely with respect to Insuring Clause (A), the term **Employee**, as defined in Subsection II. Definitions of this coverage section, is amended to include any natural person, partnership or corporation duly appointed by an **Insured Organization** to act in the capacity of such **Insured Organization's** agent (the "**Agent**"), but only while such **Agent**:

    (a)     is acting on behalf of such **Insured Organization's** as its agent; or

    (b)     is in possession of **Money**, **Securities** or **Property** belonging to such **Insured Organization** or in which such **Insured Organization** has a pecuniary interest.

The **Agent** and any partner, director, officer, or employee thereof shall be deemed to constitute a single **Employee** for the purpose of any loss.

(2)     No coverage will be available under this coverage section for the **Agent**.

(3)     No coverage will be available under this coverage section for loss caused by the **Agent** after an **Insured** becomes aware of a **Theft**, **Forgery**, or other fraudulent or dishonest act committed by the **Agent** or any partner, director, officer, or employee thereof

(4)     With respect to the coverage afforded pursuant to paragraph (1) above, Item 2., of the Declarations for this Coverage Section is amended to include the following "Sublimit of Liability" and "Deductible Amount":

| **Agent:** | Sublimit of Liability: | Deductible Amount: |
|---|---|---|
| | [Sub-Limit] | [Retention] |

It is agreed that the **Company's** maximum liability for each loss for which coverage is afforded pursuant to paragraph (1) above, shall not exceed the "Sublimit of Liability" amount set forth above, which amount is part of, and not in addition to, the Limit of Liability applicable to such loss, as set forth in Item 2 of the Declarations for this Coverage Section.

14-02-14722 (10/2008)                    Page 1
<NYFTZFOOTER><NYFTZNOTICE>

**HA-RB07648**

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

---
Authorized Representative

14-02-14722 (10/2008)                    Page 2

**HA-RB07649**


**CHUBB**

April 14, 2009

RE:   **BANYON 1030-32 LLC INSURANCE PROPOSAL**
      **INSURING COMPANY:  FEDERAL INSURANCE COMPANY**

Dear James:

Thank you for the opportunity to offer an insurance proposal for BANYON 1030-32 LLC.  The Chubb Group of Insurance Companies is proud of its ability to customize an insurance program for each account's needs.

Through the Chubb & Son division, Chubb offers products for publicly traded companies, non-profit organizations, privately-owned companies, financial institutions, health care organizations, and professional firms.  Chubb is a leader in directors & officers liability insurance, employment practices liability insurance, commercial crime/fidelity insurance, and many other specialty products.

Powersource[SM] and ForeFront Portfolio[SM] products are the first choice among private companies.  We also provide professional liability insurance for employed lawyers, as well as miscellaneous professional liability insurance programs.

Our financial stability and ability to pay claims rate among the best in the insurance industry, as attested by Standard & Poor's and A.M. Best Company, the leading insurance rating services. Agents, brokers, and prospective customers often seek out our services because our reputation in the market is well known.

If you have any questions regarding this proposal or any other products or coverages from Chubb, please call to discuss.

Sincerely,


Craig M Grant
Underwriter
Direct Phone Number: (860) 408-2692
Fax Number: (860) 408-2602
Email Address: cgrant@chubb.com

Encl:   ForeFront Portfolio Proposal


Chubb Group Of Insurance Companies   82 Hopmeadow Street          860.408.2000
                                      P.O. Box 2002                Fax 860.408.2002
                                      Simsbury, CT 06070-7683

**HA-RB07650**



April 14, 2009

**Quotation Worksheet**

Account Number:     760673
Account:            BANYON 1030-32 LLC
Account Address:    Unknown
                    Fort Lauderdale, FL  33301


Expiring Policy:    NEWLINE

Effective Date:     12:01 a.m. on May 1, 2009
Expiration Date:    12:01 a.m. on May 1, 2010

**ForeFront Portfolio**<sup>SM</sup> on Federal Insurance Company including:
General Terms and Conditions - Form # 14-02-3795

Only available for the following if indicated by an X

_____ Director & Officers Liability
_____ Employment Practices Liability
_____ Fiduciary Liability
_____ Miscellaneous Professional Liability
_____ Internet Liability
__x__ Crime
_____ Special Coverage
_____ Workplace Violence Expense


<u>**Option 1**</u>

**HA-RB07651**

## NON-LIABILITY COVERAGE SECTIONS

## BANYON 1030-32 LLC

## Crime Coverage Section

### Option 1

| Coverage | Limit | Deductible |
|---|---|---|
| Employee Theft | $5,000,000 | $500,000 |
| Premises | $5,000,000 | $500,000 |
| In Transit | $5,000,000 | $500,000 |
| Forgery | $5,000,000 | $500,000 |
| Computer Fraud | $5,000,000 | $500,000 |
| Funds Transfer Fraud | $5,000,000 | $500,000 |
| Client | $5,000,000 | $500,000 |

Indicate: _X__ Loss Sustained

Endorsements: The titles and headings are for convenience only. Please refer to the policy and endorsements for a description of coverage.

| | |
|---|---|
| 14-02-12455 | Agent Extension Endorsement |
| 14-02-13656 | Pension Protection Act Enhancement Endorsement |
| 14-02-4102 | FLORIDA AMENDATORY ENDORSEMENT TO THE CRIME COVERAGE SECTION |
| 14-02-6424 | Notice of Loss Control Services |
| MANU #1 | Define Agent |

HA-RB07652

**GENERAL TERMS AND CONDITIONS**

Endorsements – The titles and headings are for convenience only.  Please refer to the policy and endorsements for a description of coverage.

Applicable to Option 1

| | |
|---|---|
| 10-02-1295 | Important Notice to Policyholders |
| 14-02-4099 | IMPORTANT NOTICE TO FLORIDA INSUREDS  GENERAL TERMS AND CONDITIONS SECTION |
| 14-02-4100 | FLORIDA AMENDATORY ENDORSEMENT TO THE GENERAL TERMS AND CONDITIONS SECTION |
| 14-02-9228 | Compliance with Applicable Trade Sanction Laws |

**ForeFront Portfolio[SM] on Federal Insurance Company**
**Liability Coverage Sections**


**Non-Liability Coverage Sections**
Crime Coverage Section - Form # 14-02-3801

**HA-RB07653**

**Premium Summary**

**Quotation Information:**

PREMIUM DUE:               45 days from the end of the month in which the premium is effective.

BILLING TYPE:              Agency Bill

**TAX AND SURCHARGE:**

**Option 1**
Hurricane Catastrophe Fund Emergency Assessment - Florida calculates to an additional amount of
$750.00, which will appear on your invoice in addition to the stated policy premium.

CONTINGENCIES:  The above quote is expressly contingent upon receipt, review and acceptance of the
subjectivities listed below.  We must receive all of the items identified below on or before the Quotation
Expiration date shown below.  If all of these items are not received and approved by us on or before this
date, this quote will automatically expire without further action or notice.

1.     C.P.A. Audit
2.     Biographies on Management & Board of Directors
3.     CPA Management Letter
4.     Completed Application Signed and Dated by the President or CEO

**IMPORTANT**
The foregoing quotation for coverage is subject to modification or withdrawal by the Company if, before
the proposed inception date, any new, corrected or updated information becomes known which relates to
any proposed Insured's claims history or risk exposure or which could otherwise change the underwriting
evaluation of any proposed Insured, and the Company, in its sole discretion, determines that the terms of
this quotation are no longer appropriate.

This proposal does not apply to the extent that trade or economic sanctions or other laws or regulations
prohibit us from offering or providing insurance.  To the extent any such prohibitions apply, this proposal
is void ab initio.

Quotation Expiration:    30 Days

Notes:


If you have any questions, please call me at (860) 408-2692


Craig M Grant
Underwriter
Fax Number: (860) 408-2602
Email Address: cgrant@chubb.com

**HA-RB07654**

**ENDORSEMENT/RIDER**

[Print Coverage Section description on Endorsements]

Effective date of
this endorsement/rider: [Transaction
Effective Date]

[Carrier name]

Endorsement/Rider No. [Endorsement number that
is calculated when form fill-ins are entered]

To be attached to and
form a part of Policy No. [Formatted Policy Number]

Issued to: [Account Name]

---

AGENT EXTENSION ENDORSEMENT
(WITH SUBLIMIT OF LIABILITY AND SEPARATE DEDUCTIBLE AMOUNT)

In consideration of the premium charged, it is agreed that:

(1) Notwithstanding anything to the contrary contained in Subsection III. Exclusion (B) of this coverage section and solely with respect to Insuring Clause (A), the term **Employee**, as defined in Subsection II. Definitions of this coverage section, is amended to include any natural person, partnership or corporation duly appointed by an **Insured Organization** to act in the capacity of such **Insured Organization's** agent (the "**Agent**"), but only while such **Agent**:

    (a) is acting on behalf of such **Insured Organization's** as its agent; or

    (b) is in possession of **Money**, **Securities** or **Property** belonging to such **Insured Organization** or in which such **Insured Organization** has a pecuniary interest.

The **Agent** and any partner, director, officer, or employee thereof shall be deemed to constitute a single **Employee** for the purpose of any loss.

(2) No coverage will be available under this coverage section for the **Agent**.

(3) No coverage will be available under this coverage section for loss caused by the **Agent** after an **Insured** becomes aware of a **Theft**, **Forgery**, or other fraudulent or dishonest act committed by the **Agent** or any partner, director, officer, or employee thereof

(4) With respect to the coverage afforded pursuant to paragraph (1) above, Item 2., of the Declarations for this Coverage Section is amended to include the following "Sublimit of Liability" and "Deductible Amount":

| **Agent:** | Sublimit of Liability: | Deductible Amount: |
|---|---|---|
| | [Sub-Limit] | [Retention] |

It is agreed that the **Company's** maximum liability for each loss for which coverage is afforded pursuant to paragraph (1) above, shall not exceed the "Sublimit of Liability" amount set forth above, which amount is part of, and not in addition to, the Limit of Liability applicable to such loss, as set forth in Item 2 of the Declarations for this Coverage Section.

**HA-RB07655**

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

HA-RB07656



**CHUBB**

## OFFEREE DISCLOSURE NOTICE OF
## TERRORISM INSURANCE COVERAGE
(new policies and renewals with no terrorism
exclusion or sublimit and no premium charge)

Insuring Company: Executive Risk Indemnity Inc.

You are hereby notified that, under the Terrorism Risk Insurance Act (the "Act") effective December 26, 2007, we are making available to you insurance for losses arising out of certain acts of terrorism. The policy you are purchasing already includes insurance for such acts. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. However, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of the offered policy's annual premium that is attributable to insurance for acts of terrorism is: $ -0-.

If you have any questions about this notice, please contact your agent or broker.

**HA-RB07657**

# IMPORTANT NOTICE TO POLICYHOLDERS

Insuring Company: <CARRNAME>

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers"). Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478. Additional information may be available from your producer.

Thank you for choosing Chubb.

10-02-1295 (ed. 6/2007)

**HA-RB07658**

**ENDORSEMENT/RIDER**

<COVSECT>

Effective date of
this endorsement/rider: <TRXEFFDATE>

<CARRNAME>

Endorsement/Rider No. <EN>

To be attached to and
form a part of Policy No. <POLICYNO>

Issued to: <ACCTNAME>

PENSION PROTECTION ACT ENHANCEMENT ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     The definition of **Employee** as defined in Subsection II., Definitions, Paragraph (J) of this coverage section, subparagraph (3) is deleted and replaced with the following:

(3)     natural person fiduciary, trustee, administrator or **Employee** of a **Sponsored Plan** and any other natural person who handles ERISA plan assets, whether or not required to be bonded in connection with such **Sponsored Plan** by Title 1 of the Employee Retirement Income Security Act of 1974, as amended and the Pension Protection Act of 2006.

(2)     The definition of **Sponsored Plan** as defined in Subsection II., Definitions, Paragraph (AA) of this coverage section, subparagraph (2) is deleted and replaced with the following:

(2)     any other employee benefit plan or program not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, or the Pension Protection Act of 2006, sponsored solely by the **Insured Organization** for the benefit of the **Employees**, including any excess benefit plan located anywhere in the world and which existed on or before the inception of this Coverage Section or which is created or acquired after the inception of this Coverage Section; or

(3)     Subsection V., Sponsored Plan, the first full paragraph is deleted and replaced with the following:

Solely with respect to any **Sponsored Plan**, payment by the **Company** for covered loss shall be to the **Sponsored Plan** sustaining such loss. If such payment is in excess of the amount of coverage required by such Act for said Plan(s), such excess shall be held for the use and benefit of any other named Plan(s) should such Plan(s) also discover loss recoverable hereunder. The Limit of Liability applicable to any **Sponsored Plan** shall equal the lesser of ten percent (10%) of the **Sponsored Plan's** funds handled as of the beginning of such **Sponsored Plan's** fiscal year or five hundred thousand dollars ($500,000), however, with respect to any **Sponsored Plan** that holds employer stock or other employer securities, the Limit of Liability shall equal the lesser of ten percent (10%) of the **Sponsored Plan's** funds handled as of the beginning of such **Sponsored Plan's** fiscal year or a maximum of $1,000,000 (one million dollars) ("Amended Limit of Liability"). Provided, however, that the following additional conditions shall also apply with respect to such coverage:

14-02-13656 (04/2008) rev.          Page 1

**HA-RB07659**

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

<ENDSIG>
_____
Authorized Representative

Ex. 8-38

**HA-RB07660**

ENDORSEMENT

\<COVSECT\>

Effective date of
this endorsement: \<TRXEFFDATE\>

Company: \<CARRNAME\>

Endorsement No. \<EN\>

To be attached to and
form a part of Policy No. \<POLICYNO\>

Issued to: \<ACCTNAME\>

---

## FLORIDA AMENDATORY ENDORSEMENT
## TO GENERAL TERMS & CONDITIONS SECTION

In consideration of the premium charged, it is agreed that:

(1)   The Company has no obligation to renew the Policy. If the Company does not renew the Policy it will deliver or mail to the Parent Corporation at least forty-five (45) days advance written notice of non-renewal, stating the reason(s) for and effective date of non-renewal. If such notice is given less than forty-five (45) days before the expiration of the Policy, the Policy will remain in effect for forty-five (45) days after such notice is given or until the effective date of replacement coverage, whichever occurs first. Section XIX. Termination of Policy, paragraph (A)(2), is amended to the extent necessary to effectuate the foregoing.

(2)   Any notice of cancellation by the Company will state the reason for cancellation and the effective date of such cancellation.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Florida.

All other terms, conditions and limitations of this policy shall remain unchanged.

\<ENDSIG\>

_____
Authorized Representative

14-02-4100 (04/2001 ed.)          Page 1

HA-RB07661

ENDORSEMENT

<COVSECT>

Effective date of
this endorsement:  <TRXEFFDATE>

Company:  <CARRNAME>

Endorsement No. <EN>

To be attached to and
form a part of Policy No. <POLICYNO>

Issued to:  <ACCTNAME>

---

## FLORIDA AMENDATORY ENDORSEMENT
## TO THE CRIME COVERAGE SECTION

In consideration of the premium charged, it is agreed that:

1.    Section X. Proof of Loss and Legal Proceedings of the Crime Coverage Section is amended so that the reference to "two (2) years" in paragraphs (D)(1) and (D)(2) thereof is changed to "five (5) years".

2.    The Policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements of this Amendatory Endorsement shall supersede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Florida.

All other terms, conditions and limitations of this policy shall remain unchanged.

<ENDSIG>

_____
Authorized Representative

14-02-4102 (04/2001 ed.)          Page 1

**HA-RB07662**

**ENDORSEMENT**

<COVSECT>

Effective date of
this endorsement:  <TRXEFFDATE>

Company:  <CARRNAME>

Endorsement No. <EN>

To be attached to and
form a part of Policy No. <POLICYNO>

Issued to:  <ACCTNAME>

---

**IMPORTANT NOTICE TO FLORIDA INSUREDS**
**GENERAL TERMS & CONDITIONS SECTION**

To obtain information or make a complaint:

You may call Executive Risk Indemnity Inc.'s toll-free telephone number for information or to make a complaint at:

1-800-432-8168

You may also write to Executive Risk Indemnity Inc. at:

82 Hopmeadow Street
Simsbury, CT 06070-7683

ATTACH THIS NOTICE TO YOUR POLICY: This notice is for information only and does not become a part or condition of the attached document.

C31811 (04/2001 ed.)          Page 1

**HA-RB07663**

**ENDORSEMENT**

<COVSECT>

Effective date of
this endorsement: <TRXEFFDATE>

Company: <CARRNAME>

Endorsement No. <EN>

To be attached to and
form a part of Policy No. <POLICYNO>

Issued to: <ACCTNAME>

FAILURE TO MAINTAIN REINSURANCE EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that no coverage will be available under the Coverage Section referenced above for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the failure or omission to obtain, effect, or maintain reinsurance, or to comply with the terms of any reinsurance agreement.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

<ENDSIG>

_____
Authorized Representative

D32419 (04/2002)                    Page 1

**HA-RB07664**

ENDORSEMENT NO. <EN>
COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS

This Endorsement, effective at 12:01 a.m. on <TRXEFFDATE>, forms part of

| | |
|---|---|
| Policy No. | <POLICYNO> |
| Issued to | <ACCTNAME> |
| Issued by | <CARRNAME> |

It is agreed that this insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit the coverage provided by this insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

<ENDSIG>

_____
Authorized Representative

D33522 (Ed. 4/2004)

Ex. 8-43

HA-RB07665



CHUBB

*Power Source*<sup>sm</sup>
*General Terms and Conditions Section*

In consideration of payment of the premium and subject to the Declarations and the limitations, conditions, provisions and other terms of this Policy, the Company and the Insureds agree as follows:

## I.   TERMS AND CONDITIONS

Except for these General Terms and Conditions or unless stated to the contrary in any Coverage Section of this Policy, the terms and conditions of each Coverage Section apply only to that Coverage Section.  If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Section, the terms and conditions of such Coverage Section shall control for purposes of that Coverage Section.  Any defined term referenced in these General Terms and Conditions but defined in a Coverage Section shall, for purposes of coverage under that Coverage Section, have the meaning set forth in that Coverage Section.

## II.   GENERAL DEFINITIONS

(A)   **Anniversary Date** means that date and time exactly one (1) year after the date and time set forth in Item 2(A) of the Declarations, and each succeeding date and time exactly one (1) year after the previous **Anniversary Date**.

(B)   **Claim** shall have the meaning ascribed to that term in each **Liability Coverage Section**.

(C)   **Coverage Event** means the event or loss which must occur, be sustained or discovered in order to invoke coverage under each **Non-Liability Coverage Section**.

(D)   **Debtor in Possession** means a debtor in possession as such term is used in Chapter 11 of the United States of America Bankruptcy Code.

(E)   **Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**) incurred in defending any **Claim** and the premium for appeal, attachment or similar bonds.

(F)   **Financial Impairment** means the status of an **Insured Organization** resulting from:

(1)   the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise,  manage or liquidate such **Insured Organization**; or

(2)   such **Insured Organization** becoming a **Debtor in Possession**.

(G)   **Insured** means all organizations, plans and natural persons defined as Insureds in each Coverage Section.

(H)   **Insured Organization** means the **Parent Corporation** and any **Subsidiary** created at any time or any **Subsidiary** acquired on or before the inception date as set forth in Item 2(A) of the Declarations, or subject to Section XI Changes in Exposure of these General Terms and

**HA-RB07666**



CHUBB

*Power Source*<sup>sm</sup>
*General Terms and Conditions Section*

Conditions, during the **Policy Period**. **Insured Organization** shall also mean any such entity as a **Debtor in Possession** or an equivalent status under the law of any other country.

(I)   **Insured Person** shall have the meaning ascribed to that term in each Coverage Section. Solely with respect to any **Liability Coverage Section**, coverage for an **Insured Person** shall also include coverage for:

    (1)   the lawful spouse of such **Insured Person**, if named as a co-defendant with such **Insured Person** solely by reason of such spouse's status as a spouse, or such spouse's ownership interest in property, which is sought by the claimant as recovery for an alleged **Wrongful Act** of such **Insured Person**; and

    (2)   in the event of the death, incapacity or bankruptcy of an **Insured Person**, the estate, heirs, legal representatives or assigns of such **Insured Person**;

    but any such coverage shall apply only with respect to a **Wrongful Act** of such **Insured Person**. All terms and conditions of this Policy, including without limitation, the Deductible Amount applicable to **Loss** incurred by the **Insured Person**, shall also apply to loss incurred by such spouses, estates, heirs, legal representatives and assigns of such **Insured Person**.

(J)   **Liability Coverage Section** means the Directors & Officers Liability, Employment Practices Liability, Fiduciary Liability, Miscellaneous Professional Liability and the Internet Liability Coverage Sections of this Policy, if purchased as set forth in Item 4 of the Declarations.

(K)   **Loss**:

    (1)   with respect to any **Liability Coverage Section**, shall have the meaning ascribed to that term in such Coverage Section; or

    (2)   with respect to any **Non-Liability Coverage Section**, means the total amount covered under such Coverage Section as a result of any **Coverage Event**.

(L)   **Non-Liability Coverage Section** means the Crime, Kidnap/Ransom and Extortion and Workplace Violence Expense Coverage Sections of this Policy, if purchased as set forth in Item 6 of the Declarations.

(M)   **Parent Corporation** means the entity named in Item 1 of the Declarations.

(N)   **Policy Period** means the period of time set forth in Item 2 of the Declarations, subject to any prior termination in accordance with Section XIX Termination of Policy of these General Terms and Conditions.

(O)   **Policy Year** means the period, within the **Policy Period**, from the date and time set forth in Item 2(A) of the Declarations to the first **Anniversary Date**, or the period from an **Anniversary Date** to its next succeeding **Anniversary Date**, subject to any prior termination as set forth in Section XIX Termination of Policy of these General Terms and Conditions.

(P)   **Potential Employment Claim** means a complaint or allegation of a **Wrongful Act** in connection with **Discrimination**, **Harassment**, **Retaliation**, **Workplace Tort** or **Wrongful Employment Decision** that does not constitute an **Employment Claim** but which may subsequently give rise to an **Employment**

**HA-RB07667**

**Claim** brought by or on behalf of an **Insured Person** that is lodged with the **Insured Organization's** human resource department or other department that provides a



**CHUBB**

*Power Source*<sup>sm</sup>
*General Terms and Conditions Section*

function similar to a human resource department.  Solely with respect to this Definition (P), the terms **Wrongful Act, Discrimination, Harassment, Retaliation, Workplace Tort, Wrongful Employment Decision, Employment Claim and Insured Person** shall have the meaning ascribed to them in the Employment Practices Liability Coverage Section.

(Q)    **Potential Third Party Claim** means a complaint or allegation of a **Wrongful Act** in connection with **Third Party Discrimination** or **Sexual Harassment** that does not constitute a **Third Party Claim** but which may subsequently give rise to a **Third Party Claim** brought by or on behalf of a **Third Party** that is lodged with the **Insured Organization's** legal department or an individual responsible to receive such complaints or allegations.  Solely with respect to this Definition (Q), the terms **Wrongful Act, Third Party Discrimination** or **Sexual Harassment, Third Party Claim** or **Third Party** shall have the meaning ascribed to them in the Employment Practices Liability Coverage Section.

(R)    **Related Claims** means all **Claims** for **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

(S)    **Subsidiary** means:

(1)    any entity during any time in which the **Parent Corporation** owns or controls, directly or through one or more **Subsidiaries**, the right to elect or appoint more than fifty percent (50%) of such entity's directors or trustees;

(2)    any limited liability company during any time in which the **Parent Corporation** owns or controls, directly or through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of such entity's managers;

(3)    any corporation during any time in which the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, exactly fifty percent (50%) of the issued and outstanding voting stock and which, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock of such corporation, the **Parent Corporation** solely controls the management and operation of such corporation ("Controlled Joint Venture"); and

(4)    any foundation, charitable trust or political action committee during any time in which such entity or organization is controlled by the **Parent Corporation**.

(T)    **Wrongful Act** shall have the meaning ascribed to that term in each **Liability Coverage Section**.

---

**III.    TERRITORY**

Coverage shall extend anywhere in the world.

---

**IV.    EXTENDED REPORTING PERIOD**

C31767 (Ed. 04/01)                    Page 4 of 18                    Form 14-02-4545

**HA-RB07669**

(A)     If any **Liability Coverage Section** is either terminated or not renewed for any reason other than nonpayment of premium, any **Insured Organization** or any **Insured Person** shall have the right to purchase an Extended Reporting Period for one of the periods set forth in Item 9(A) of the

HA-RB07670


CHUBB

*Power Source*<sup>sm</sup>

*General Terms and Conditions Section*

Declarations. This right to purchase an Extended Reporting Period shall lapse unless written notice of the desired Extended Reporting Period, together with payment of the additional applicable premium due as set forth in Item 9(B) of the Declarations is received by the **Company** within sixty (60) days after the end of the Policy Period.

(B)    If the Extended Reporting Period is purchased, then coverage otherwise afforded by such **Liability Coverage Section** will be extended to apply to **Loss** from **Claims** first made during such Extended Reporting Period but only for **Wrongful Acts** committed or allegedly committed before the end of the **Policy Period** or the date of any conversion of coverage described in Section XI Changes in Exposure of these General Terms and Conditions, whichever is earlier. The entire additional premium for the Extended Reporting Period shall be deemed fully earned at the inception of such Extended Reporting Period. The Limit of Liability for the Extended Reporting Period shall be part of and not in addition to the applicable Limits of Liability for the **Policy Year** immediately preceding the expiration of the **Policy Period**.

## V.    LIMIT OF LIABILITY

(A)    Solely with respect to all **Liability Coverage Sections**:

    (1)    If the combined maximum aggregate Limit of Liability for all **Liability Coverage Sections** is purchased, as set forth in Item 3 of the Declarations, such amount shall be the combined maximum aggregate liability of the **Company** for all **Loss** from all **Claims** first made during each **Policy Year** under all **Liability Coverage Sections** combined, regardless of the number of **Claims**; provided that, the maximum aggregate liability of the **Company** for all **Loss** from all **Claims** first made during each **Policy Year** under each **Liability Coverage Section** shall not exceed the respective maximum aggregate Limit of Liability as set forth in Item 4 of the Declarations, regardless of the number of **Claims**. If the maximum aggregate Limit of Liability of any **Liability Coverage Section** as set forth in Item 4 of the Declarations, is less than the combined maximum aggregate Limit of Liability for all **Liability Coverage Sections** as set forth in Item 3 of the Declarations, such lesser limit shall be a sublimit and such amount shall be part of, and not in addition to, the combined maximum aggregate Limit of Liability for all **Liability Coverage Sections** as set forth in Item 3 of the Declarations.

    (2)    If the combined maximum aggregate Limit of Liability for all **Liability Coverage Sections** is not purchased, as set forth in Item 3 of the Declarations, the maximum aggregate liability of the **Company** for all **Loss** from all **Claims** first made during each **Policy Year** under each **Liability Coverage Section** shall be the respective maximum aggregate Limit of Liability as set forth in Item 4 of the Declarations, regardless of the number of **Claims**.

    (3)    Except as otherwise expressly provided in any **Liability Coverage Section**, **Defense Costs** are part of and not in addition to the applicable maximum aggregate Limit of Liability as set forth in Item 4 of the Declarations and payment by the **Company** of **Defense Costs** shall reduce and may exhaust such Limit(s) of Liability.

(B)    Solely with respect to each **Non-Liability Coverage Section**, the **Company's** maximum liability shall be the respective Limit(s) of Liability described in the applicable **Non-Liability Coverage Section**.

Ex. 8-49

**HA-RB07671**